JOHNSTON BROTHERS CLAY WORKS, Appellant, v. STANDARD LUMBER COMPANY, Appellee.

TRIAL: Directed Verdict. Record reviewed, and held to contain no substantial support for the allegation that the term "pit-run sand and gravel" had a specified "trade" meaning.

*Appeal from Webster District Court.*—H. E. FRY, Judge.

MARCH 11, 1924.

ACTION to recover the contract price for a certain 250 tons of sand and gravel sold and delivered by the plaintiff to the defendant, pursuant to a written order therefor. The answer pleaded a general denial. It pleaded also certain alleged oral and contemporaneous variations of the written contract, and a

counterclaim. There was a verdict for the defendant, and judgment entered thereon. The plaintiff appeals.—*Reversed.*

*Price & Burnquist,* for appellant.

*Mitchell, Files & Mulholland* and *Hugh Stuart,* for appellee.

EVANS, J.—The plaintiff company owns and operates a sand and gravel pit at Clayworks, in Webster County. On September 27, 1921, the defendant ordered in writing a shipment of "250 tons pit-run sand and gravel at 75 cents per ton, F. O. B. Clayworks, Iowa." The shipment was to be made to Lanedale, Iowa, a station one and one-half miles distant from Rockwell City, which was defendant's place of business. The shipment was made accordingly. The action is brought for the agreed price, plus prepaid freight. The defendant purported to reject the shipment, on the ground that it did not conform in quality to the oral promises and representations made, nor to the quality stipulated in the written order. During the trial, and while its witness Hartzler (hereinafter referred to) was upon the stand, defendant filed an amendment to its answer, which contained the following:

"Defendant states that the words 'pit-run sand and gravel' used in the order sued on in this case have a recognized use and meaning in the trade and business of selling and using sand and gravel, and mean sand and gravel free from dirt and other impurities in sufficient quantities to interfere with or destroy said material for use in concrete or other masonwork; that the material shipped defendant by plaintiff was not pit-run sand and gravel, according to the recognized meaning of said terms, but was mixed with clay and other impurities, and was wholly worthless and without value."

The foregoing excerpt from the answer indicates the only substantial issue of fact in the case and the only question submitted by the court to the jury. It was the contention of the plaintiff on the trial that the term "pit-run sand and gravel" means exactly what the words import in their natural meaning. It is undisputed that the sand shipped by the plaintiff con-

formed in quality to the natural run of the pit.  On behalf of
the defendant, it is contended argumentatively that the term
"pit-run sand and gravel" has a trade meaning which imports
a certain quality or degree of purity.  These conflicting conten-
tions were submitted to the jury.  The only material question
for our consideration now is whether the defendant produced
into the record any evidence to support its contention in argu-
ment, and whether, within the contemplation of the parties to
the contract, any other meaning was attached to the term in
question than the words naturally import.  We turn, therefore,
to the testimony of the principal witness for the defendant on
that subject, Hartzler.  This witness was the superintendent and
general manager of the defendant company.  He was present
at the negotiations preceding the signing of the order by Er-
shim, a subordinate employee.  He testified in direct examination
quite indefinitely that the shipment was not suitable for con-
crete work, and that it did not conform to the order.  On cross-
examination, he testified as follows:

"On direct examination, I said I didn't recall what Mr.
Brooks [plaintiff's agent] said in respect to a certain meaning,
or the words in the contract.  I don't remember what Mr.
Brooks said about it.  It was about a couple of weeks prior to
this time that we had received a carload of gravel from John-
ston Bros. which was in our bin at that time.  It was pit-run
gravel.  Pit-run gravel varies in different pits.  There is no
such thing as a uniform standard pit-run gravel for different
pits.  If there were 25 pits in Webster County, the simple term
'pit-run gravel' would not indicate that there might be more
than one quality of pit-run gravel.  Q.  Pit-run gravel means
nothing more than the gravel as it comes from the pit, without
being washed?  A.  Yes, sir.  Q.  That is all that it is?  A.
Yes, sir.  Q.  Pit-run gravel, as usually spoken of, generally
means sand and gravel as it comes from the pit?  A.  Yes, sir.
There are several processes used in the treatment of gravel.
There is screened, washed gravel.  There are different methods
of treating gravel, and different sized meshed screens through
which it passes.  They have quarter-inch screens, through which
only material less than a quarter of an inch gets through.  They
have one sixth and one eighth screens.  By washing gravel is

meant, washing the dirt and mud out of it. Gravel mined from the same pit may be washed or screened, or pit-run gravel. The quality of the pit run depends on the quality of the soil in the pit. Taking 14 or 15 different pits, the pit run from each pit would not necessarily correspond with the pit run in another pit. If I were buying pit-run gravel or screen gravel of a certain quality, I would expect it to be about the same, no matter where it came from."

On redirect examination, he testified as follows:

"Q. Mr. Hartzler, I will ask one more question. Is there any percentage of impurity recognized that may exist in pit-run sand and gravel in the trade? A. Yes, sir. Q. I wish you would explain, if that is true, what is meant by the term 'pit-run sand and gravel.' A. Pit-run sand and gravel means just sand and gravel, and not half clay * * * Q. When you say it shouldn't contain over three or four per cent, is that your understanding of the trade meaning of these terms? (Objected to as incompetent, immaterial, and irrelevant, under the issues, and also assuming that he has already stated in this record that it shouldn't contain more than 3 or 4 per cent of impurity. Objection overruled. Plaintiff excepts.) A. Yes, sir."

On re-cross-examination, he testified as follows:

"I remember that this morning we were talking about what was meant by pit-run sand and gravel. I remember that we said that, if we had 25 different pits, the pit run might vary in each pit. 'Pit run,' as distinguished from the other terms of washed gravel, or screened gravel, is sand and gravel just as it comes from the pit. That was what I meant, and intended to say. That is my idea at this time, that pit-run sand and gravel means that it is sand and gravel just as it comes from the pit, unwashed and unscreened. It is true that pit-run sand and gravel from one pit might vary on account of impurities, as compared to another pit near by. Also, the pit run may vary in the same pit, owing to the character of the stripping done from the surface at different times, and to the different qualities of the soil. Q. Pit run just means what it says; just as it comes from the pit, unwashed and unscreened? A. No, I don't think so. Q. Isn't that what you mean by the term 'pit-run sand and gravel,' to distinguish it from washed gravel or screened gravel,—just

the pit run, as it comes from the pit?   A.   If the sand and gravel— Q. Now, I am talking about sand and gravel as it is termed here.   What I asked you was if the term 'pit-run sand and gravel' means the gravel as it comes, and the sand as it comes from the gravel pit.   A.   Yes, sir.   If you loaded five tons of clay from a clay pit, it would not be pit-run sand and gravel; it would be pit-run clay.   Q.   What I am getting at is, the use of the term 'pit-run sand and gravel' means just the run of the material as it comes from the pit, unwashed and unscreened? A.   Yes, sir.   Q.   That is what you understood it to mean in September, 1921?   A.   Yes, sir.   Q.   That is what you understand it to mean now?   A.   Yes, sir.''

It will be seen from the foregoing that, if any of it has any tendency to support the contention of the defendant, it is the last answer, ''Yes, sir,'' of the redirect examination.   What is above set forth in the cross-examination of this witness is in exact accord with the testimony of the plaintiffs as to their interpretation of the meaning of the terms used.   We need not set out such evidence.   There is no conflict in the testimony, therefore, as to what the parties mutually understood by the terms used in the written contract.   The defendant, however, made further effort to establish its contention by the testimony of Van Wegen.   He was in no manner connected with the contract.   He was a concrete worker, and testified to the quality of sand and gravel required for concrete work.   His direct evidence is in some confusion, but it contains the following:

''Q.   Mr. Van Wegen, does the trade work of handling sand and gravel by builders and mechanics recognize any particular percentage of impurities that might exist, and the sand and gravel still meet the term 'pit-run sand and gravel?'   (Objected to for the same reasons last above stated: there being no allegation that this sand and gravel was to be used for any such purpose, and no contract for such use, by mechanics and builders. Objection overruled.   Plaintiff excepts.)   A.   Yes, sir.   Q.   What is that percentage?   (Same objection as last urged.   Objection overruled.   Plaintiff excepts.)   A.   Not to exceed 3 or 6 per cent, owing to the purpose for which it is to be used.''

On cross-examination, he explained himself as follows:

''Pit-run sand and gravel is sand and gravel just as it comes

from the pit in size. 'Pit-run sand and gravel' means just as it comes from the pit, before it is screened. Pit-run sand and gravel may be washed, and then it is washed pit-run sand and gravel. If pit-run gravel contains more than 6 per cent of silt, it should be washed before it should be used for concrete work. In all my answers to questions as to the quality of gravel that can be used for concrete work, I have had in mind gravel that contained no more than 3 to 6 per cent of silt. If pit-run sand and gravel contains more than that percentage, it is not fit for concrete work. If it contained more than 6 per cent, I would wash it, until it became fit for concrete work. Generally, un-screened gravel containing less than 6 per cent of silt, regardless of size, may be used for concrete work. There are some kinds of concrete work that require gravel to be screened into different sizes. When sand and gravel are put over a quarter-inch screen, the remaining material would be called 'gravel,' and the material that went through the screen would be 'sand.' The silt would go through with the sand. Sand is always sand, regardless of how big or how small it is.''

According to the foregoing testimony, pit-run sand and gravel is the unwashed and unscreened production of the pit. The distinction between sand and gravel is in the size of the grain. If uniformity of grain is desired, it is accomplished by screening. If reduction of silt or impurity is desired, it is accomplished by washing. The plaintiff in its business sold ''washed'' sand, ''screened'' sand, and the ''pit run.'' This order was for pit run. We are compelled to say, therefore, that this record discloses no evidence in support of defendant's contention as to the meaning of the terms used in the contract. We do not overlook that there was a wide variance in the testimony of the parties respectively as to the amount of silt or impurity contained in the shipment. Each of them tested samples. The defendant's test showed 12 per cent to 14 per cent impurities. The plaintiff submitted its samples to an expert connected with the highway commission at Ames, who tested five samples, which showed a variation of impurity running from 2.4 per cent to 2.9 per cent. It appeared also, in support of the motion for a new trial, that the defendant had submitted a sample to an expert, during the trial, to be tested by him; that he made the test, and

reported the same to counsel for the defendant. His test showed 4½ per cent silt. He was not used by the defendant. Though such testimony bears upon what would be deemed the larger merits of the controversy, it has no bearing upon the issues as made, unless the jury could find from the evidence that the trade meaning of the terms used was as contended by defendant in argument. At the close of the defendant's evidence, and again at the close of all the evidence, the plaintiff moved for a directed verdict on the ground that the evidence presented no conflict upon any material issue in the case. Upon the record, the motion ought to have been sustained.

The judgment below is, accordingly,—*Reversed.*

ARTHUR, C. J., PRESTON and FAVILLE, JJ., concur.